DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF CALIFORNIA.

---

[No. 20131. In Bank. — February 27, 1886.]

## IN THE MATTER OF THE CONTEMPT OF CHRISTOPHER A. BUCKLEY.

CONTEMPT — AGREEMENT TO INFLUENCE DECISION OF COURT — EVIDENCE. — The proceeding was brought to punish the defendant for an alleged contempt of the Supreme Court. The accusation charged in effect that the defendant, well knowing that the judgments in certain cases then pending before the court had been affirmed, in consideration of a sum of money to be paid him, undertook and agreed with one of the respondents therein to procure the court to render judgments in the respective cases in their favor. The accusation further charged that the defendant, at the time of the alleged agreement, assured the person with whom he made it, and induced him to believe, that he possessed such influence with the court and the members thereof that he could procure the judgments to be so rendered. *Held*, that the conduct charged in the accusation constituted a contempt of court, but that the guilt of the defendant was not established by the evidence.

ID. — GUILT MUST BE ESTABLISHED BY CLEAR AND SATISFACTORY EVIDENCE. — A proceeding to punish for an alleged contempt, not committed in the presence of the court, is criminal or *quasi* criminal in its nature, and before a conviction can be had therein the guilt of the accused must be established by clear and satisfactory evidence. A mere preponderance of evidence is not enough.

PROCEEDING to punish for a contempt of court. The facts are stated in the opinion of Mr. Justice Thornton.

LXIX. CAL.—1

*William Matthews, E. R. Taylor,* and *H. J. Tilden,* Committee of the San Francisco Bar Association, *Attorney-General Marshall, A. L. Rhodes, O. P. Evans,* and *J. C. Cary,* for Relators.

*Preston & McPike,* and *D. H. Regensburger,* for Respondent.

THORNTON, J. — This is a proceeding taken against the respondent, Buckley, for an alleged contempt of this court. The contempt charged relates to the cases of *Bonnet* v. *City and County of San Francisco,* and *Parker* v. *City and County of San Francisco,* which were pending in this court on appeal before, on and after the tenth day of May, 1884. In each of these causes, judgment of affirmance was rendered by this court on the day last named. These judgments of affirmance were in favor of Bonnet and Parker. The contempt charged is, that on the said day the defendant, well knowing that these causes had been decided by this court in favor of the parties above mentioned, affirming judgments in their favor given in the court below, for and in consideration of the sum of five hundred dollars, which Bonnet agreed to pay him, agreed and undertook with Bonnet that he, Buckley, would procure to be given and made by this court a judgment in favor of Bonnet and Parker, respectively, in the cases above stated; that Bonnet was at the same time assured by Buckley, and was made to believe, that he (Buckley) possessed such influence with this court and the members thereof that he could procure through his influence said judgments in said actions to be given and made respectively in favor of said Bonnet and Parker.

Buckley, in obedience to an order to show cause, appeared herein, and in a verified answer denied the charge in every particular.

That the conduct with which respondent is here charged is a contempt of this court, we have no doubt.

This is a proposition of law to us so plain that we think it unnecessary to discuss it further.

The material question to be considered relates to the guilt of respondent. The guilt of respondent must be established as a fact by clear and satisfactory evidence. If not so established, this court has no right to punish him.

It should be remembered that the proceeding here taken is criminal or *quasi* criminal. It was so held by this court in *Ex parte Crittenden*, 62 Cal. 534, following *New Orleans* v. *Steamship Co.*, 20 Wall. 387, where it is said: "Contempt of court is a specific criminal offense." (See also *Hummel's Case*, 9 Watts, 421; *Cartwright's Case*, 114 Mass. 230; *Durant* v. *Supervisors*, 1 Woolw. 377; Com. Dig., tit. Attachment, 4; 4 Bla. Com. 288.)

The punishment for a contempt may be fine or imprisonment, or both,— a punishment appropriate to criminal offenses. (See Code Civ. Proc., secs. 1218, 1219.) Under such circumstances, the guilt of the party charged should be proved and established by clear and satisfactory evidence. A mere preponderance of evidence would not be sufficient to warrant the infliction of so serious a punishment. We know of no rule of law in this state authorizing any court to fine and imprison a person on a mere preponderance of evidence as to his guilt. The guilt must be established by clear and satisfactory proof, and generally, if not always, in criminal actions, beyond a reasonable doubt. It would be against all correct rules of law and principles of justice to permit guilt, under such circumstances, on a conviction of which punishment so serious and severe may follow, to be established by less than clear and satisfactory proofs.

In the matter of the application to disbar R. E. Houghton, an attorney of this court (67 Cal. 511), it was said: "A judgment against the respondent will deprive him of personal and property rights. Unless we are clearly satisfied of respondent's guilt, we ought not to remove

or suspend him from the practice of his profession. As we are not so satisfied, we decline to strike his name from the roll." These remarks apply to this case. Such, in our judgment, is the legal result deducible from our statute relating to contempts (Code Civ. Proc. secs. 1209, 1210, etc.), by which an issue is required to be made up and tried as to the guilt of the accused. (Code Civ. Proc., secs. 1217–1219.)

It may be remarked that this was not so at common law. In such proceedings in courts of law not committed in *facie curiæ*, if a party charged with contempt cleared himself by his oath denying his guilt, he was by a court of law discharged. If, however, in making such oath, he was perjured, he might be prosecuted for perjury. Such is the statement of Blackstone as to proceedings upon such contempt in courts of law (see 4 Bla. Com. 287); and this is confirmed by the authorities.

But in this state the subject is regulated by statute as stated above. And of contempts not in face of the court an issue is made up by answer, and witnesses are called and examined as in other causes. In other words, a trial is had as in other cases.

In this case the contempt charged not having been committed in the face of the court, a trial was had on the pleadings and evidence.

The evidence in regard to the transaction in which the contempt is said to have been committed is found in the testimony of B. Bonnet, J. W. Taylor, and the respondent. Bonnet was the plaintiff in the above-named case of *Bonnet* v. *The City and County of San Francisco.* Bonnet testified that " on the 10th of May, 1884, he and Joseph W. Taylor met Buckley at his saloon in the city of San Francisco, about 8 o'clock in the evening. Buckley invited them inside his private place, and then the respondent said to him: 'You got a case in the Supreme Court.' 'I told him yes'; Taylor told him before they got to Buckley's saloon, 'Buckley could get a judgment

for you right away,' and when we got there, Buckley in
his private room said: 'I can get judgment for or against
you in this case'; and Taylor said: 'I suppose the judges
will be down here to-night or to-morrow,' to which Buck-
ley said: 'O yes, there is two already here.' Taylor asked
him (Bonnet): 'Well, suppose we make a note for five
hundred dollars.' He asked him if five hundred dollars
was satisfactory to him, or something of that kind, and
said, 'Suppose we make a note for five hundred dollars
and give it to him.' I says, 'I won't pay no five hun-
dred dollars. I won't pay it. My brother won't author-
ize me to do so.' 'Well,' he (Taylor) says, 'I will pay
half of it.' 'Well,' I says, 'all right, if you pay half of
it we will pay it,' and then Taylor drew a note himself
and gave it to me to sign. I signed the note. I told
him, says I, 'Ain't you going to sign?' He says, 'No, I
don't want my name to appear, but it is understood I
pay half of it.' And I said, 'Mr. Buckley, is that cor-
rect? You won't make my brother responsible for more
than two hundred and fifty dollars?' 'Yes,' he says, 'and
Taylor will pay over the other half.' ' 'Well,' he (Buck-
ley) says, 'I can have this judgment rendered immedi-
ately, and date it to-day, to-morrow, or Monday, or any
time you want it.' I says, 'It is not particular about the
date; I don't care about that.' So we met and parted
that way, I think. Taylor gave the note to Buckley in
his presence, and it was left with him.''

The witness, at request of the prosecuting counsel, ex-
plained the reference to his brother. The money, he
said, belonged to his brother, Eli Bonnet. It appeared
that the claims belonged to Eli Bonnet, who had assigned
them over to him, which he had assigned to Taylor.
The claims in both the cases of Bonnet and Parker had
been assigned to Taylor some time before as security for
money advanced, and the witness was acting for his
brother, who was sick. When a settlement was had
with Taylor he was present, and two hundred and fifty

dollars was retained out of the money in payment for that note. When this settlement was had, Taylor, D. H. Whittemore, M. J. Kelly, Eli Bonnet, and himself were present. Buckley was not there, in fact had gone East. The money was not paid to Kelly, who had the note, but Taylor kept it, and said that he would see that the note was paid. At the time the note for five hundred dollars was given to Buckley, B. Bonnet stated that he did not know that judgment had been rendered in the Supreme Court; that he did not know of it until the following Monday, the 12th of May, when he saw it in a newspaper. He then told Taylor not to pay the note; that it was obtained on *false pretensions.* This is, in substance, the testimony of Bonnet, which has any bearing on the matter of the contract.

Buckley was called, and testified as to the interview with Taylor and Bonnet on the evening of the 10th of May. He said:—

"My recollection of the affair is, that Mr. Taylor called upon me at my place of business that evening, in May, with a gentleman he said was Mr. Bonnet, and asked me if he could see me privately for a few moments. I went with him into a room in my saloon. Mr. Taylor introduced me to Mr. Bonnet, and said he was very anxious to see me in relation to the matter of these claims that was coming up before the board of supervisors; was very anxious that I should interest myself for him in trying to have these matters brought before the board. Some conversation in relation to the matter took place.

"Q.—State what it was, as near as you can recollect it.

"A.—As near as my recollection serves me, it was this: Mr. Taylor told me that in matters of this kind, that before obtaining their money they had to go before the board of supervisors, and recited some cases, and among others the name of Phelan that was adjudicated by the court, and went to the board of supervisors and there remained some four or five years, going from one board

to the other, and the object of my assistance was to have this matter brought up and acted upon by the board of supervisors, and he asked me if I would not interest myself. I told him I did not know what I could do. I had known Mr. Taylor for a long time, and was willing to do anything I could for him; so Mr. Taylor and this other gentleman had a conversation between themselves, and they afterwards returned to me and said: 'We do not want your services for nothing. We are willing to agree to pay you for it if you will assist us to have this matter brought up. We will pay you five hundred dollars, and to secure your payment of it will give you a note,' which they did, and I agreed to assist them and do what I could in the matter.

"That is about the conversation as I recollect it."

Buckley further testified that the name of the Supreme Court was never mentioned during the conversation; that nothing was said of the members of the Supreme Court, and their names were never mentioned; nothing was said of his influence with the Supreme Court, or of his ability to procure decisions; that he never at any time or place had a conversation with Bonnet or any one else in relation to the Supreme Court or any member of it, or regarding his influence with the Supreme Court; that he had never stated to any person that he had any influence with the Supreme Court, or that he could procure decisions; that he had stated to the best of his recollection the whole of the conversation that took place at the time referred to; that Bonnet's statement of the conversation was false from beginning to end, and that no such conversation as that detailed by Bonnet ever took place with him or in his presence.

It appeared in evidence that a dispatch had been sent from Sacramento, on the morning of the 10th of May, 1884, signed by J. W. McCarthy, then clerk of the Supreme Court, addressed to Buckley, Bush Street, San Francisco, in these words: "Parker and Bonnet v. San

Francisco, judgment affirmed"; that this dispatch was received in San Francisco at 10:43 A. M., and delivered at Buckley's place of business to one Thomas F. Doran, who was an employee of Buckley's, at 323 Bush Street, at 10:48 A. M.

Buckley testified that he never received this dispatch, and had no recollection of ever hearing it read, until it was read in his presence this morning. His secretary testified to the like effect. Doran was not called. Taylor is called, and gives his version of what took place at Buckley's saloon on the evening of the 10th of May, and testified: "I know no more or less than that Mr. Bonnet wanted me to go and see Mr. Buckley. He wanted me to take him up there. He did not know him, and wanted to see him, to help us through the board, and I took him up there. . . . . . I told him I would, and went up there and met Mr. Buckley, and told him Mr. Bonnet wanted to see him about helping him get some judgments through the board of supervisors. He said that he did not know if he could do much of anything to get the bills through." The witness referred in this to the payment of the judgments. The witness further stated: "I told him. I said, 'Mr. Bonnet thinks you can help us, and he would like to have you help us if you can.' He said, 'Taylor, I do not know that I can,' and I said, 'Mr. Bonnet does not want you to do this for nothing, and if you will help us, he will give you something'; and he said, 'I do not know that I can do anything,' and Bonnet said, 'He can, if he likes, help us.' He says, 'If he wants, he can do it.' Bonnet says to me, 'Look here, you had better give something,' and I said, 'What do you want to give him? I am satisfied to let things go as they are.' I was drawing sixty dollars a month interest; and he said, 'Well, we had better offer him five hundred dollars,' and I said, 'All right; if you want to help us through the board, Mr. Bonnet is willing to give you a note for five hundred dollars, and whenever the money is paid from

the treasury, the bill is paid,' and he said, 'I do not know. I will try and do what I can, but I do not know whether I can help you any, Taylor.' Then I drew up the note, and put the name of Bonnet in. I made a common note on a printed form. I drew the note up there. I did not know, and had not heard at that time, that the cases of Bonnet and Parker against the city had been decided. Nothing was said in the conversation of the Supreme Court, or the judges of the court. Nor did Buckley speak of his influence with that court. The name of a Supreme Court judge was never mentioned in the conversation. Never at any time had any conversation with Buckley touching his influence with the Supreme Court. He never agreed to pay half of the note for two hundred and fifty dollars."

There was testimony showing that Taylor admitted before the committee of the Bar Association that when the conversation took place, on the evening of the 10th of May, 1884, he knew that the Supreme Court had decided the Bonnet and Parker cases.

It will thus be seen that Buckley and Taylor contradict Bonnet's testimony as to the conversation of the 10th of May. Buckley and Taylor both state that the Supreme Court was not mentioned, nor was the name of any of its members mentioned or referred to, nor anything said by Buckley in regard to it.

It is urged that the guilt of the respondent is established by circumstances which appear in evidence. It appears from the testimony that Buckley took some steps to procure the advancement of the cases of Bonnet and Parker by this court. The testimony in relation to this matter is substantially as follows: Not long before the order advancing the cases was made by this court, Buckley states that Taylor called on him at his place of business, and said that he had an assignment of cases or judgments, and wanted him to procure some information for him from the city and county attorney's office in re-

lation to the trial of this case (*Bonnet* v. *The City*), and also to see if he would go among his friends here,—attorneys,—and see if we could get a place on the calendar; get them a substitute for the case that they might have on that calendar. For this service, he received five hundred dollars from Taylor at the time; that at the time he received the money, he did not know that it was the money of B. Bonnet. He ascertained afterwards that the cases were advanced without his aid, and that he has never offered to return the five hundred dollars received by him. He went around among the attorneys, and found a place for the cases on the calendar, which they did not use. The case for which they were substituted was an entirely different one. He never represented to Taylor that he had any influence with the Supreme Court by which he would have the causes advanced. Taylor informed him that the city attorney would not try the cases if they were advanced, and he wished to find out if he would try the cases if they were advanced. He never intimated to Taylor, or any one else, that he had even an acquaintance with the Supreme Court, or had any influence over it, in any way, shape, or form. Buckley stated further, that he went to the office of the city and county attorney, saw Mr. Craig, who was then such attorney, and told him that he was not an attorney; told him of the cases, and asked him if there was any objection, and he said no; said he would try the cases, and he gave this information to Mr. Taylor.

In this transaction the Supreme Court was not talked about or discussed, nor were its members.

It should be stated here that the cases referred to were advanced on motion of counsel, in accordance with the usual practice of this court, a practice which had obtained for several years.

Another circumstance is the receiving of the dispatch, which has been mentioned above. It is only necessary to say further in regard to it that this dispatch was sent

to Buckley by a deputy in the clerk's office, in accordance with a custom which had for some time existed in that office. It was sent by Deputy Williams in consequence of a request put on a notice board kept in the clerk's office. This request was put on that board by Meyers, another deputy in the clerk's office, who was a friend of Buckley's, on a supposition that Buckley had some interest, or felt some interest in the cases. The dispatch was not sent until the opinions of the court in the case referred to had been filed in the office of the clerk.

With regard to the first circumstance relating to the advancing of the causes, we cannot perceive how this tends in any way to prove that Buckley is guilty of the contempt charged. It has no relevancy in that regard. Take the evidence of Buckley's connection with the advance of the cases, it appears that that transaction had been entirely concluded before the contempt is charged to have been committed, and we must say that what the evidence shows Buckley did in regard of such advancement was nothing more than any citizen might have done without impropriety. He did not pretend to act in the matter as an attorney. He went to the office of the city and county attorney and procured some information and found a case in place of which the cases could be substituted. Really, as it turned out, the cases were advanced on motion of an attorney of this court, who appeared in the cases, in place of a case other than that which was found by Buckley. The above is all Buckley did, and in that we see nothing wrong. In this remark we express no opinion as to his receiving five hundred dollars for his services in regard to advancing the cases. If the parties chose to pay him that sum for his services, they had a right to do so. In regard to the whole matter of advancing the causes, there is no evidence that Buckley ever pretended or gave out that he had any influence with this court, or that he was using such pretended influence in any way.

With regard to the other circumstance, it is said that Buckley testified falsely when he stated that he never received the dispatch sent from Sacramento on the 10th of May.    Concede that this is so, that he did swear falsely in this regard, his receipt and knowledge of it would tend to show that his statement in regard to his employment to use his influence with the board of supervisors was true.

It may be asked that if he did not receive this dispatch, and neither he nor Taylor nor Bonnet knew that the cases were decided, why should they make any agreement with regard to the board of supervisors?    Why make any such agreement in advance of the decision by this court of the Bonnet and Parker causes?    It does appear improbable that any such agreement should be made in advance of the action of this court.    But on an improbability of this character this court cannot base a judgment of guilt.    Nor would it be justified in rendering any such judgment on such improbability, taken in connection with all the other testimony in the case.    In our view, the probability is, that he received the dispatch and knew of the judgment of this court at the time of the interview of the 10th of May, and, in this view, the improbability urged vanishes.

From a review of the whole evidence we are of opinion that the guilt of the respondent is not made out.    The evidence in favor of innocence, in our judgment, predominates.    Bonnet's testimony alone tends to prove guilt, and that is contradicted by respondent and Taylor.

We are further of opinion that Bonnet is impeached by the testimony of F. A. Hornblower, J. H. Knight, and John Lewis, who testify that they knew Bonnet's general reputation for truth and honesty and integrity, and that it is bad.

It should be also observed here that Bonnet is an accomplice with Buckley and Taylor on his own admission.    In relation to the testimony of an accomplice, it

is provided by the Penal Code, section 1111, that "a conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which, in itself; and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

There is no evidence, which in itself, without the aid of the testimony of Bonnet, tends to connect Buckley with the commission of the offense charged. In fact Bonnet's testimony is the only evidence of the commission of the offense.

The foregoing rule as to accomplices should have its due weight in passing on this cause.

We are of opinion that guilt of Buckley is not shown, and that the order to show cause should be discharged, and the proceedings dismissed.

So ordered.

MORRISON, C. J., and SHARPSTEIN, J., concurred.

MYRICK, J., concurring.—1. As to the law. I have no doubt of the proposition that if a person pretend or give out that he can, by improper means, influence the decisions of this court, he is guilty of a contempt, and may be punished. The power to adjudge and punish for a contempt in such case is inherent in the court, and has not been circumscribed by the constitution. It is not necessary to look to the statute to see if such an act has been declared to be a contempt, or the punishment therefor has been defined. The judicial department, in this regard, adjudges for itself, being responsible, as in other cases, for the abuse of the power. To illustrate, as to the inherent power of the court; suppose the statutes were silent as to what acts constitute a contempt, and as to the punishment—suppose a person should, in open court,

by violent conduct, disturb and interrupt the proceedings; could it be maintained that the court was powerless, except to turn the person over to the police? I think not. This inherent power should, however, like all power, be prudently but firmly exercised when necessary.

It has been well said by a great writer that "a judge who listens to private solicitations is a disgrace to his post." "If it should prevail it preverts justice; but if the judge be so just and of such courage, as he ought to be, as not to be inclined thereby, yet it always leaves a taint of suspicion behind it." A person who gives out that he can by private solicitations or personal influence procure decisions by a judge, does all he can to bring the office into contempt. The vulgar fellow who misbehaves in open court and interrupts its proceedings commits an offense trifling in character as compared with him who holds himself out as capable of bringing the very office itself into disgrace, and of making the administration of justice a mockery. The very existence of a court, *as a court*, needs not only the quiet order of decorum, but it needs the confidence of the community in the impartiality of its decisions.

2. As to the facts. The decisions in the Bonnet and Parker cases, in this court, were filed in the clerk's office at Sacramento about 10 o'clock A. M., of May 10, 1884. On the trial in this proceeding Bonnet testified that during the afternoon of that day Taylor sought him, and said Buckley wished to see him; that in the evening they went to Buckley's place of business, and there Bonnet executed to Buckley his promissory note for five hundred dollars, the consideration for which was Buckley's professed influence with this court to obtain decisions in the cases in Bonnet's favor, and on such day as he pleased. The chief circumstance in corroboration of Bonnet's testimony is that a deputy clerk of this court, immediately upon the decisions being filed, sent to Buckley a

telegram stating the fact; and this telegram was in due course received by Buckley's barkeeper at 10:48 A. M. On the other hand, Buckley and Taylor testified that at no time was this court or any member thereof mentioned; that they expected favorable decisions by reason of a former decision involving the same principle; that the note was given for the services to be rendered in urging action on the part of the board of supervisors looking to speedy payment in case of favorable decisions in this court; Taylor and another witness testified that it was Bonnet who sought Taylor for the purpose of being introduced to Buckley instead of Taylor seeking Bonnet; the deputy clerk swore that the telegram was sent without any request from Buckley, and because he supposed Buckley had some interest in the cases, as he had heard him, some time before, making inquiries about them; and Buckley and his secretary swore that the telegram did not reach them; Buckley not having the use of visual organs could know of the telegram only by its being stated or read to him, which, they say, was not done.

It will thus be seen that the testimony as to the substantial point, viz., whether Buckley assumed or gave out that he could influence the action of this court, is in direct conflict, Bonnet swearing upon one side, Buckley and Taylor on the other. It is possible that the explanation given by the deputy clerk as to the sending of the telegram is correct; if so, it fitted in so closely between the filing of the decisions and the making of the note as to give rise to stringent criticism.

I heard all the testimony in open court, and since the hearing I have twice read it carefully through, and the result is, that I have grave doubt as to which side is correct. Bonnet admitted to having said that Buckley had done no wrong, and that there never would have been any trouble about the matter, except for a subsequent disagreement between himself and Taylor, regarding $650 of the money received on the judgments. How

far was Bonnet's testimony influenced by his annoyance in being, as he supposed, overreached in the settlement? How far was Buckley's and Taylor's testimony influenced by a desire to be relieved from a grave charge? I am unable to arrive at a satisfactory conclusion. I cannot say that I have an abiding conviction, beyond reasonable doubt. I am therefore of opinion that the charges are not proven.

Ross, J., dissenting.—I dissent. The gist of the charge against the respondent, Buckley, is, that in the evening of the tenth day of May, 1884, he undertook for a money consideration to be paid to him by one Bonnet, to procure the judgment of this court favorable to the plaintiffs in two certain actions entitled respectively *Bonnet* v. *The City and County of San Francisco* and *Parker* v. *The City and County of San Francisco*, at the time representing that he possessed such influence with the justices of the court as would enable him to procure such judgments as he desired. As a matter of fact, the cases referred to were decided at the city of Sacramento, shortly after 10 o'clock A. M. of the tenth day of May, 1884, but of that fact Bonnet was ignorant, and the respondent Buckley claims to have been ignorant until some time after the expiration of the day mentioned. In his answer respondent explicitly denies that he ever, at any time or under any circumstances, undertook to procure any decision in the cases referred to, or in any other case or cases, or that he ever represented that he had, or pretended to have, any influence with this court or with any justice thereof; but that the consideration, and the sole consideration, for the money Bonnet agreed to pay him, was certain services that he, respondent, agreed to render Bonnet in expediting the disposition of his claims by the board of supervisors of the city and county of San Francisco.

While strenuously contesting the truth of the charge against him, respondent claims that even if it should be

found to be true, it does not constitute a contempt of court, for which offense the present proceeding is prosecuted.

It is contended that the legislature has defined contempts, and the punishment thereof, and that the charge in question does not come within the statute, the provisions of which, it is claimed, are exclusive. I am inclined to think that the charge in question is embraced by the ninth subdivision of section 1209 of the Code of Civil Procedure, but assuming that it is not, I am of opinion that this court has the inherent power to punish for contempts. It is true that the power to punish for contempts may be limited and defined by the authority creating the court (*Ex parte Robinson*, 19 Wall. 510); but can the power of a court created by the constitution to punish for contempts be limited and controlled by an act of the legislature? I think not. While every court should be very careful not to assume to itself powers it does not possess, it is no less its bounden duty to exercise its powers in all proper cases. The Supreme Court of this state was created by the constitution, and exists by virtue of its provisions. It not only has the right of existence by virtue of the constitution, but it is thereby charged with the performance of important functions. Its jurisdiction cannot be diminished by legislative enactment. Every power necessary to the due and proper performance of the duties with which it is charged is impliedly conferred by the organic act creating it. "Certain implied powers," said the Supreme Court of the United States, in *United States* v. *Hudson*, 7 Cranch, 32, "must necessarily result to our courts of justice, from the nature of their institutions. . . . . To fine for contempt, imprison for contumacy, enforce the observance of order, etc., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others; and so far our courts, no doubt, possess powers not immediately derived from statute."

In the case of the *State* v. *Morrill*, 16 Ark. 384, where
it was contended, as it is here, that the court was con-
trolled by the statute and could not go beyond its pro-
visions, the Supreme Court in holding against the
proposition asked these pertinent questions:—

"Had the legislature never passed the act above quoted,
or any act at all on the subject, could it be doubted that
this court could possess the constitutional power to pre-
serve order and decorum, enforce obedience to its process,
and maintain respect for its judgments, orders, and de-
crees, and as a necessary consequence, punish for con-
tempts against its authority and dignity, without which it
could never accomplish the useful purposes for which
it was established by the framers of the constitution?

"If the general assembly were to repeal the act, would
any lawyer seriously contend that the courts were thereby
deprived of the power to punish contempts? One of the
counsel of the defendant frankly admitted that they
would not, and the admission concedes the position to
be true, that the power of this court to punish contempts
is inherent, springing into life along with, and as an in-
cident to, those great judicial powers carved out for its
exercise by the constitution."

My conclusion on this branch of the case is, that as
this court has the constitutional right of existence it has
the constitutional right of self-protection, which cannot
be taken away or abridged by legislative enactment.

The next inquiry to be made is, whether the act
charged against the respondent, if true, constitutes a
contempt of court? This question cannot admit of any
sort of doubt. No stream can be pure whose source is
tainted. There can, therefore, be no greater or fouler
blow at the administration of justice than for one to
falsely and fraudulently pretend and undertake, for a
money consideration, and by means of a pretended in-
fluence with the judge, to procure a particular decision.
Such a practice, if allowed to prevail, would destroy all

confidence in courts, and sap the very foundation upon which society rests. It would therefore be a most fatal and dangerous interference with the administration of justice, and in every instance where it is shown should be visited with severe and summary punishment, not, as said by an English judge, for the sake of the judges as private individuals, but because they are channels through which justice is conveyed to the people.

It remains to consider whether the evidence establishes the fact charged, that respondent did undertake for a money consideration, to be paid him by Bonnet, to procure the judgment of this court favorable to the plaintiffs in the suits mentioned,—at the time representing that he possessed such influence with the justices of the court as would enable him to procure such judgments as he desired.

In respect to this question the testimony is very conflicting, but there are certain facts about which there can be no doubt. One is, that the cases referred to were decided by this court in Sacramento, in favor of the respective plaintiffs therein, shortly after 10 o'clock A. M., of the tenth day of May, 1884. Another is, that within a few minutes after the opinions in the cases were filed with the clerk, a telegram was sent by a deputy clerk, in the name of his principal, to the respondent Buckley, advising him of the decisions, and delivered to an employee of respondent at his place of business on Bush Street, in the city of San Francisco, before 11 o'clock A. M., of the same day. Another is, that about 8 o'clock in the evening of the same day Buckley, Bonnet, and one Taylor met in the private room of Buckley, at his place of business, and there Bonnet promised to pay Buckley a certain sum of money for *some* purpose, and as an evidence of his promise executed to Buckley his promissory note for five hundred dollars. The consideration for the note is the subject-matter of the present inquiry, and in respect to that, the testimony of Bonnet,

on the one side, and of Buckley and Taylor on the other, is in direct conflict. According to his own testimony, Bonnet was a party to the offense, and therefore, apart from the further facts that the testimony tends to show that his character for truth, honesty, and integrity is bad, and that a part of his testimony in the case is contradicted by that of other and third parties, we ought not to find against Buckley, unless there are other facts and circumstances in the case that satisfy us of the truth of Bonnet's statement of the transaction. Buckley's version of it is here given in his own language: "My recollection of the affair is, that Mr. Taylor called upon me at my place of business that evening, in May, with a gentleman he said was Mr. Bonnet, and asked me if he could see me privately for a few moments. I went with him into a room in my saloon. Mr. Taylor introduced me to Mr. Bonnet, and said that he was very anxious to see me in relation to the matter of these claims that were coming up before the board of supervisors; was very anxious that I should interest myself for him in trying to have these matters brought before the board. Some conversation in relation to the matter took place."

Being asked to state what it was as near as he could recollect, the witness replied: "As near as my recollection serves me it was this: Mr. Taylor told me that in matters of this kind, that before obtaining their money, they had to go before the board of supervisors, and recited some cases, and, among others, the name of Phelan, that was adjudicated by the court and went to the board of supervisors, and there remained some four or five years, going over from one board to the other, and the object of my assistance was to have this matter brought up and acted upon by that board of supervisors, and he asked me if I would not interest myself. I told them I did not know what I could do. I had known Mr. Taylor for a long time, and was willing to do anything I could for him, so Mr. Taylor and this other gentleman had a con-

versation between themselves, and they afterwards re-
turned to me and said: 'We do not want your services
for nothing. We are willing to pay you for it, if you
will assist us to have this matter brought up. We will
pay you five hundred dollars, and to secure you payment
of it, will give you a note,' which they did, and I agreed
to assist them and do what I could in the matter. That
is about the conversation as I recollect it."

Now, in considering this testimony it must be borne
in mind that Taylor denied on this hearing that he
knew, and Buckley testified that he had no recollection
of knowing, at the time of making the agreement, that the
cases had, in fact, been decided by the court, although it
was shown that Taylor had previously stated before a
committee of the Bar Association that he was, at the
time, aware of the fact. There is no pretense that Bon-
net knew of the decisions at the time of the arrangement
in the room of Buckley's saloon in the evening of the
10th of May, or that Buckley or Taylor informed him of
them. If none of these parties knew that the cases had
been decided, the inquiry naturally arises, Why should
they at that time be arranging for a prosecution of the
claims before the board of supervisors? Until the
plaintiff's judgments should be affirmed by the court,
there was nothing to be presented to the board. An
affirmance of the judgments by this court was a condi-
tion precedent, without which there was nothing for the
board to act on. From the stand-point of ignorance of
the fact that the cases had been decided by the court,
there was therefore no occasion whatever for any arrange-
ment for the prosecution of the claims before the board
of supervisors. But for another reason I cannot accept as
true the statement that Buckley and Taylor had no notice
of the decisions in the cases of Bonnet and Parker at the
time of the arrangement with Bonnet in the evening of
the tenth day of May.

As has been said, it was shown on the hearing of this

matter that Taylor admitted before the committee of the
Bar Association that he had such knowledge, but he at-
tempted to explain away that fact in his testimony here
by saying that he did not understand the questions asked
him on those proceedings.  An examination of the re-
porter's notes, however, shows that he could not have
misunderstood the questions in that behalf, for they
were perfectly simple and direct, and were several times
repeated and answered.  Nor is ignorance on Buckley's
part of the fact that the cases referred to had been decided
by this court at the time of the arrangement in question
consistent with Taylor's knowledge, or the still more
pregnant fact that a telegram from the clerk's office of
this court, advising him of the decisions, was delivered
to one of his employees at his place of business prior to
to 11 o'clock A. M. of the tenth day of May.  Apart from
the presumption that a telegram so delivered reached him,
all of the circumstances of the case point to the fact that
it did.  I must therefore find that both Taylor and
Buckley knew of the decisions of this court, in the cases
of Bonnet and Parker, at the time of the interview be-
tween Taylor, Bonnet, and Buckley, about 8 o'clock
in the evening of the tenth day of May.  Knowledge of
that fact on the part of Taylor and Buckley, and igno-
rance of it on the part of Bonnet, is consistent with the
statement of Bonnet, as to what the agreement between
the parties really was, while it is inconsistent with Buck-
ley's and Taylor's statement of it.  Then, again, the ac-
ceptance of Bonnet's promissory note by Buckley is con-
sistent with Buckley's and Taylor's knowledge of the
decisions; for Taylor held an assignment of Bonnet's
interest in the actions to secure the payment of certain
advances he had made him.  In case of the affirmance
of the judgments in the cases of Bonnet and Parker,
Bonnet would have money and the note would be good.
But except his interest in these actions, the testimony
shows Bonnet to have been wholly impecunious,—so

much so, indeed, that about the time of the transaction in question he borrowed fifty dollars of Taylor, for which he gave him his (Bonnet's) note for *one hundred and fifty dollars*, and which was subsequently, and within a short time, paid out of the amounts collected upon the judgments in the actions of Bonnet and Parker; and for the sum of forty-five dollars borrowed of one Long, he executed to the latter his promissory note for *three hundred dollars*, which was also paid out of the proceeds of the same judgments. Still another consideration points to the same conclusion, and it is this: Buckley testified that shortly after Bonnet gave him the five-hundred-dollar note, he (Buckley) left California for the East, but before doing so he turned the note over to his friend, M. J. Kelly, whom he said could do as much with the supervisors as himself. But it is not pretended that either Buckley or Kelly ever did or attempted to do anything in the matter before the board of supervisors, but it does appear that after the money had been collected from the city upon the settlement between Taylor and Bonnet, Taylor deducted from Bonnet's portion two hundred and fifty dollars, which he paid to Kelly on the note.

The fact that Taylor, who had in his hands all of the money collected on the judgments, only paid *one half* of the five-hundred-dollar note given by Bonnet to Buckley, strongly corroborates Bonnet's statement that at the time the note was given the agreement was that Taylor should pay one half of it and he (Bonnet) the other half.

I cannot at all agree to what is said in the prevailing opinion with respect to the five hundred dollars paid to Buckley by Taylor in the matter of procuring the advancement of the cases of Bonnet and Parker on the calendar of the court. In so far as that matter has any bearing upon the charge in question, it strengthens the conclusion to which I have come. To believe that Taylor paid Buckley five hundred dollars simply to go to some attorneys and ask if they had a case they did not

wish to try, and in lieu of which they would agree that the Bonnet and Parker cases might be placed, requires more credulity than I possess.

As a matter of fact the Bonnet and Parker cases were advanced on the calendar by stipulation of the attorneys in the respective cases. Taylor, who was a real party in interest in the Bonnet and Parker cases, and who, as appears, had frequent interviews with the attorney in them, either communicated the proposed arrangement with Buckley to the attorney, or he did not. If he did not, that circumstance of itself would strongly strengthen the suspicion that the arrangement was not of the peculiar character stated by Buckley and Taylor. If he did communicate the proposed arrangement to the attorney, can it be believed the latter would have advised or permitted his client to pay five hundred dollars to effectuate an advancement of the cases on the calendar,—an advancement which if practicable at all could have been legitimately secured by the attorney. While, as has been said, the testimony is very conflicting, the circumstances corroborate the statement of Bonnet as to what the agreement was, and satisfies me that he told the truth about it. I therefore think the respondent should be adjudged guilty of the contempt charged, and should be punished accordingly.

McKinstry, J., concurred with Mr. Justice Ross.

McKee, J., dissenting.—This is a proceeding to punish Christopher A. Buckley and J. W. Taylor for contempt.

The charge is that, on the 10th of May, 1884, Buckley represented to one B. Bonnet,—a party to a cause then pending in this court, that he could influence the court and the members thereof to give a favorable decision in the cause; and that he undertook and agreed, for a large sum of money to be paid to him by Taylor and Bonnet,

to influence the judges of the court to render a decision in the cause in favor of Bonnet.

The charge rests upon the testimony of Bonnet, Taylor, and Buckley, who were the principal parties to the transaction, which gave occasion for the charge. The testimony is very conflicting; but after a careful sifting of the testimony I find that the following constitute the facts and circumstances of the transaction:—

In the year 1884 two cases were pending in this court, viz.: *B. Bonnet* v. *The City and County of San Francisco*, and *C. H. Parker* v. *The City and County of San Francisco*, in which appeals had been taken from judgments rendered in the Superior Court of said city and county. On the morning of Saturday, the 10th of May, 1884, opinions in both cases, affirmatory of the judgments, were sent down by the court, then in session at Sacramento. Immediately after the opinions were filed in the clerk's office, a telegraphic dispatch, in the name of the clerk of the court, was sent to the respondent, Buckley, as follows:—

"Sacramento, 10th.

"To Chris Buckley, Bush Street, San Francisco: Parker and Bonnet v. San Francisco, judgments affirmed."

At 10:48 o'clock of the same day the dispatch was delivered at respondent Buckley's saloon.

The only unusual thing in connection with the transmission of such a dispatch from the clerk's office of this court is, that neither of the respondents was an attorney or counselor, or party in either of the two cases; but both had connections with them. Taylor was assignee of the judgment appealed from in the Bonnet case, as security for payment of a large sum of money, bearing interest at a high rate, which he had advanced to Bonnet; and Buckley in his testimony states: "About a year before . . . . I was asked by Taylor to do something about the cases. . . . . Taylor called upon me at my place of

business, and stated that he had an assignment, I think Bonnet against the city, and wanted me to procure some information for him from the city and county attorney's office, in relation to the trial of this case, and also to see if I would go among my friends here—attorneys—and see if we could get a place on the calendar; get them substituted for the case that they might have on the calendar. . . . .

"Q.—Did you get any money for that service?

"A.—I did, sir.

"Q.—How much money?

"A.—Five hundred dollars.

"Q.—Who paid it to you?

"A.—Taylor. . . . .

"Q.—You say that you went to the office of the Supreme Court for a calendar?

"A.—Yes, sir.

"Q.—Did you tell the clerk for what you wanted it?

"A.—I might have told him so; I might have mentioned the circumstances to him.

"Q.—You cannot tell whether you mentioned these two cases?

"A.—I presume I did. I do not know."

Both Buckley and Taylor were therefore financially connected with the cases, and from that connection and the testimony of Buckley I think it fairly deducible that Buckley arranged in the clerk's office to receive immediate information of the filings of opinions in the cases when the court decided them; and that pursuant to such an understanding the dispatch of Saturday, the 10th of May, 1884, was promptly sent to him from the clerk's office. In his condition, being blind, he did not see or read the dispatch, but it was received and read; and I have no doubt that the person who received it informed Buckley of the fact of the affirmance of the judgments in the cases. Both Buckley and Taylor therefore knew, on Saturday morning, that the judgments of the Superior

Court in the cases had been affirmed. In fact, Taylor admits that on his examination before the Bar Association he confessed that on Saturday he "knew all about the affirmance of the judgments." Subsequently, it is true, on his examination before the court, he tried to break the force of his confession by saying that he was confused by the questions which were asked him. But it is also a fact that on Saturday, about 12 o'clock M., Taylor met Bonnet on Montgomery Street, and conveniently arranged with him for a secret interview with Buckley about the cases.

For what purpose? Bonnet testifies that on Saturday he was utterly ignorant of the fact that the cases were decided; and intensely anxious to have them immediately decided; for, as Taylor testifies, Bonnet was complaining that the interest which he had to pay on the claims was "eating him up." In his necessity, and believing that Buckley had succeeded in getting the cases advanced on the calendar,—although Buckley confesses "that the cases were, in fact, advanced without his aid or assistance,"— Bonnet corruptly conceived the idea that Buckley had personal and political influence enough to secure a speedy decision of the cases in his favor. This he believed until it became in his mind a fixed idea. And when he met Taylor, on Saturday at noon, he readily proposed or consented to an arrangement for an interview with Buckley, for the purpose of putting that idea into operation. Upon the subject and object of the interview, both Taylor and Bonnet were of one mind, for it is a fact that Taylor, before starting prepared himself with the printed form of a promissory note; and in going to the interview encouraged Bonnet by telling him as they went: "Buckley can get a judgment for you right away."

They got to Buckley's place of business about eight or half-past eight o'clock at night. Bonnet testifies: "When we got there, Buckley invited us inside his private place, and there he said to me, 'You got a case in the Supreme

Court?' I told him yes. He then said: 'I can get judgment for or against you in the cases.' . . . . Then Taylor said: 'I suppose the judges will be down here to-night or to-morrow,' and Buckley said, 'O yes, there is two already here.'" At this point in the conversation, Bonnet and Taylor retired to a corner of the room, where Taylor drew from his pocket the promissory note for five hundred dollars, which Bonnet had signed, or then signed, with the understanding that Taylor was to pay half of it; and they then returned and delivered it to Buckley, saying: "We do not want your services for nothing. We are willing to agree to pay you for it, if you will assist us to have this matter brought up. We will pay you five hundred dollars, and to secure your payment of it will give you a note," which, says Buckley, they did, "and I agreed to assist them, and do what I could in the matter."

The fact is then fairly established that, on Saturday, the day the telegraphic dispatch from the then clerk of the court was delivered at Buckley's place of business, the secret interview took place at the room and place testified; and that the result of the interview was the execution and delivery to Buckley of a note for five hundred dollars, for personal or political services to be rendered by him in the cases. So far, not the slightest conflict exists in the testimony. The three men agree that a night conference was held, and that a corrupt arrangement was made for securing Buckley's services for some purpose in connection with the cases. But Buckley testifies that the statements of Bonnet as to the services to be rendered are wholly false, and so Taylor testifies.

Both tell the same story, namely, that the note was given to secure the personal services of Buckley for the purpose of influencing members of the board of supervisors to pay the claims. Is that true?

I find the story improbable, because there is one thing beyond controversy, and that is, that Buckley and Taylor on Saturday knew or did not know of the decision of

the cases. If they did *not* know, then they did know, or had every reason to believe, that the cases were still pending and undetermined, and that the claims involved in them were not collectible from the city, or enforceable against it; Bonnet did *not* know that the cases were decided. That is manifest from the circumstance that the fact of filing the opinions in the cases on Saturday was not publicly announced until the following Monday, when it was published, for the first time, in the San Francisco Evening Bulletin. Being alike ignorant that any decisions had been rendered in the cases, it follows that none of these parties could have been actuated by any motive to meet together to make a corrupt arrangement for the collection of claims which the city was contesting in the courts, and there was no reason why either Bonnet or Taylor should attempt to bring personal or political influences to bear upon members of the board of supervisors to pay claims upon which they could not then act.

On the other hand, if Buckley and Taylor knew that the cases were decided, then they used their knowledge as a veil to cover the pretense held out to Bonnet that Buckley could get a decision of the court in his favor "right away"; and in either case, I think the truth of Bonnet's testimony as to what transpired at the private interview on Saturday night is substantially proved,—proved, not only by all the circumstances of the interview itself, but by the subsequent conduct of the parties to it.

Taylor admits that, upon a division of the spoil, among the persons who had become, one way and another, interested in the cases, he applied two hundred and fifty dollars of Bonnet's portion to the payment of the note, and that he himself refused to pay any part of it. And although Buckley testifies: "I was to receive five hundred dollars to aid these gentlemen in bringing these matters up before the board of supervisors,—that is my understanding of it,"—yet he virtually admits no such

understanding, expressed or implied, existed at the interview, by confessing that he neither took action nor thought of acting upon such an understanding.   On his examination upon that subject, he answered as follows:—

"Q.—You were to go to them—the members of the board of supervisors—privately?

"A.—I presume so.

"Q.—To speak to each member?

"A.—I should judge so.

"Q.—And ask them to pay these claims?

"A.—No, sir; to ask them to bring bills up and act upon them.

"Q.—Did you make any request of any supervisor?

"A.—No, sir; I did not.

"Q.—Did you go before any committee of the board, or to any member on this subject?

"A.—I did not.

"Q.—Did you go to the board in session?

"A.—No, sir.

"Q.—Did you go to any member of the board?

"A.—No, sir.

"Q.—What did you do for this $500?

"A.—Nothing."

From the conduct and acts of the men, I therefore deduce the fact that the note was not given to pay Buckley for influencing the members of the board of supervisors, but that it was given for the purpose testified to by Bonnet.

I do not overlook the fact that Bonnet is an accomplice to a corrupt transaction, and that his testimony is tainted, and needs corroboration, but I find it corroborated, not by words, but by the acts and deeds of Buckley and Taylor as they themselves have testified.

The question then remains: Is one who falsely holds himself out as a court broker to a suitor in a cause pending in the court, and agrees for a large sum of money to procure for him a favorable decision in the cause, by his

professed personal or political influence with the members of the court, guilty of contempt of court?

I think it needs neither argument nor authority to show that such an act is a contempt of court. The thing is evil, immoral, invalid, and criminal; any contract founded upon such a transaction would be illegal and void, and unenforceable in the courts; and under the code law of this state, it is, in itself, and independent of any attempt at fulfillment, a contempt of court. The law declares: "Any interference with the . . . . proceedings of a court is a contempt of court." (Code Civ. Proc., subd. 9, sec. 1209.)

To dissuade a witness in a cause from attending court to testify in the case is an unlawful interference with the proceedings of the court; to threaten, by letter or otherwise, a suitor in a cause pending in court, against prosecuting it, is an unlawful interference with the proceedings of the court; to falsely pretend to a suitor in a cause that jurors trying it can be corruptly influenced with money to return a favorable verdict for him is an unlawful interference with the proceedings of the court; and *a fortiori* is it, when such corrupt pretense is held out to a suitor about the judges of the court, for the purpose of extorting money from the suitor for such a purpose.

In support of these propositions numerous cases might be cited. All the authorities, indeed, tend to the same point; they show that it is immaterial what measures are adopted; if the object is to taint the source of justice and to obtain, or profess to be able to obtain, a result of legal proceedings different from that which would follow in the ordinary course of proceedings, it is a contempt of the highest order.

"One," say the Supreme Court of Indiana, "who does .a wrongful act for the purpose of bringing unmerited disgrace upon the officers of the court, or the members of the jury, is guilty of a contempt. One who, for the

purpose of securing money for himself, falsely pretends to another, interested in the result of the cause, that he can corruptly influence with money the jurors trying the cause to return such a verdict as he desires, is guilty of a contempt. Such an act tends to disgrace and degrade the jury in the mind of the person to whom the corrupt proposition is submitted. No man has a right to falsely insinuate that he can, by corrupt means, influence jurors in the performance of their duty. It would be a reproach to the law, if shameless men were permitted to slander honest officers and jurors by vile insinuations." (*State* v. *Little*, 90 Ind. 338.)