## FROELICH v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit.
July 6, 1929.

No. 8161.

Donald G. Hughes, of Minneapolis, Minn., for plaintiff in error.

Lewis L. Drill, U. S. Atty., and James A. Wharton, Asst. U. S. Atty., both of St. Paul, Minn., for the United States.

Before KENYON and VAN VALKENBURGH, Circuit Judges, and OTIS, District Judge.

OTIS, District Judge. In the District Court the plaintiff in error was found guilty of contempt of court and was sentenced to imprisonment in a county jail for a period of six months. The case is here on writ of error from that judgment. The facts are these:

In the month of January, 1927, at a term of the District Court of the United States for the District of Minnesota then being held at Winona, Minn., Judge John B. Sanborn presiding, an indictment was returned by a grand jury against Frank W. Sommers and others. John S. Pratt, a special assistant to the Attorney General of the United States, with the United States attorney for the District of Minnesota, was in charge of the case, both at the time of its presentation to the grand jury and thereafter. Joel M. Dickey was clerk of the United States District Court for the District of Minnesota.

After the indictment had been returned, and before the trial of the case, plaintiff in error, Gottlieb W. Froelich, a citizen of Minnesota, wrote on a typewriter in a business building several blocks removed from the Federal Building at St. Paul, Minn., a letter. This letter he placed in an envelope, addressed it to John S. Pratt, at Toledo, Ohio, mailed it, and it was thereafter delivered to Mr. Pratt in Toledo. The letter was as follows:

"Cor. 4th and Cedar Sts., Globe Bldg.,
"St. Paul, Minn., January 29, 1927.

"Hon. John S. Pratt, Special U. S. Attorney, Toledo, Ohio—Dear Sir: It may be perhaps of some interest to you that the rumors about town are that prospective jurymen are being interviewed with the end that if a promise to vote for acquittal of Sommer and his associates at the trial of the case here, that they will be called as a juror.

"It is also reported that with a favorable jury and Judge Sanborn presiding, who is a close friend and business associate of Frank W. Sommer's that not much harm can come to them at the coming trial.

"It is further reported that while Mr. Sommer's was chief of police he stole from a prisoner a number of bonds, the particulars of which one of your men may perhaps secure from a local attorney here, W. R. Duxbury.

"It is further reported that one or more of the grand jurors at Winona were approached by Judge Sanborn in an endeavor to forestall the finding of an indictment against Frank W. Sommer's.

"Your informer is not at all interested in the aforestated matters further and other than that the truth or falsity thereof be substantially ascertained and established, and that the Department of Justice forthwith

take proper steps and exercise the proper precautions, guaranteeing a fair and just trial in court in place of having the whole matter arranged beforehand.

"It is all important that Joel M. Dickey, clerk of the U. S. District Court, be forthwith removed from said office, and that the Hon. John B. Sanborn be not permitted to preside at the trial thereof.

"Respectfully submitted,
"A Citizen, St. Paul, Minn."

Several weeks after he received this letter, Mr. Pratt sent it to Judge Sanborn. Thereafter contempt proceedings were instituted by information against the plaintiff in error. At the trial of the case it was admitted that the plaintiff in error had written and mailed the letter, and there was testimony that, before mailing it, he exhibited it or copies of it to two residents of St. Paul. It was contended at the trial in behalf of the plaintiff in error, and is now contended, that his acts did not constitute punishable contempt of court, and that the letter was a privileged communication, and as such could not be made the basis of a contempt proceeding.

 1. The statute under which a district court may punish for contempt, section 268 of the Judicial Code, section 385, title 28, U. S. Code (28 USCA § 385), so far as it is pertinent here, is as follows:

"The said court shall have power * * * to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority. Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice. * * *"

Clearly the acts of the plaintiff in error were not committed in the presence of the court. If, then, they were punishable at all as contempt, it must be on the theory that they were "so near thereto"—that is, so near to the presence of the court—"as to obstruct the administration of justice." If the idea of physical propinquity is involved in the phrase "so near thereto as to obstruct the administration of justice", then the acts of the plaintiff in error can scarcely be said to be within the statute. The mere writing of the offending letter was, of course, not contempt. It was the delivery of the letter at Toledo, Ohio, to the special assistant to the Attorney General, which completed and was necessary to the completion of the contempt, if any there was.

But the contention, long asserted, that only that is so near to the presence of the court as to obstruct the administration of justice which, from its physical proximity to the court, disturbs and interferes with judicial proceedings, was finally disposed of by the Supreme Court in Toledo Newspaper Company v. United States, 247 U. S. 402, 419, 38 S. Ct. 560, 564 (62 L. Ed. 1186). In that case, referring to section 268 of the Judicial Code, the Supreme Court said:

"The provision therefore, conformably to the whole history of the country, not minimizing the constitutional limitations nor restricting or qualifying the powers granted, by necessary implication recognized and sanctioned the existence of the right of self-preservation; that is, the power to restrain acts tending to obstruct and prevent the untrammeled and unprejudiced exercise of the judicial power given by summarily treating such acts as a contempt and punishing accordingly. The test, therefore, is the character of the act done and its direct tendency to prevent and obstruct the discharge of judicial duty— a conclusion which necessarily sustains the view of the statute taken by the courts below. * * *"

Whether an act, then, is within section 268, depends, not on the place where it is committed, but on its character. If it tends to obstruct and prevent the untrammeled and unprejudiced exercise of the judicial power, it is punishable contempt. It was said by the District Judge in United States v. Toledo Newspaper Company (D. C.) 220 F. 458, 487 (and it was his view of section 268 which the Supreme Court approved in the language above quoted):

"Following United States v. Anonymous [(C. C.) 21 F. 761], federal authorities are consistent in applying the principle that the criterion whether a given act is 'so near the presence of the court as to obstruct the administration of justice' is not in the physical propinquity of the occurrence to the court, but abides in the degree of approximation the act attains in affecting an immediate duty before the court; that there may be invidious acts or misbehaviors occurring remote from the physical presence of a sitting court, in place or time or both, yet so direct in their tendency to affect the administration of the court's duties in a pending cause as to be an obstruction thereof, and, consequently, within the statute. It is the quality of obstruction to the administration of justice that measures the propinquity of the act to the court."

If, then, the acts of the plaintiff in error were such as tended to obstruct the adminis-

tration of justice with respect to a matter at the time pending before the District Court for the District of Minnesota, they were punishable as contempt, without regard to the place of their commission, unless they were immune from such punishment as privileged acts.

That the acts of the plaintiff in error did have a tendency to obstruct the administration of justice seems to us clear. It is not important that they did not actually obstruct the administration of justice, or that they might not necessarily have that result. If their tendency was of that character, that is sufficient. As the Supreme Court said in Toledo Newspaper Company v. United States, supra, 247 U. S. loc. cit. 421 (38 S. Ct. 565): "The wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case." The letter which the plaintiff in error wrote and caused to be delivered to the special assistant to the Attorney General, who was in charge of the prosecution of the case then pending in the District Court, was obviously written for the express purpose of causing an affidavit of prejudice to be filed. The letter concluded with the injunction that "it is all important that * * * the Honorable John B. Sanborn be not permitted to preside in the trial." This followed a recital of intimations of the most scandalous character impugning the integrity of Judge Sanborn. The natural effect of the entire letter, if its contents were believed by the recipient, was to induce him to file an affidavit of prejudice. While it cannot be said, of course, that the mere filing of an affidavit of prejudice, which the law provides for under proper circumstances, obstructs the administration of justice, undoubtedly one who seeks to induce an attorney in a case to file such an affidavit, by laying before him false and malicious statements as to the uprightness and honor of a trial judge, if the result is the filing of an affidavit of bias and prejudice, does obstruct the administration of justice. That obstruction follows from the necessary rearrangement of judicial machinery and possible delays incident to the filing of such an affidavit.

In still another way the acts of the plaintiff in error tended to obstruct the administration of justice. Even if the result sought to be accomplished by him, the disqualification of Judge Sanborn, was not accomplished, even if no affidavit of prejudice against Judge Sanborn was filed, nevertheless the letter tended to obstruct the administration of justice. The tendency of the letter was to create in the mind of the recipient, an attorney in a case then pending, a suspicion as to the integrity of the judge, a possible belief in that attorney's mind that the result of the trial would be influenced by something other than the merits. He would be led to suspect, not only the judge, but the jury and the officers of the court. From these suspicions would arise such an atmosphere of doubt and misgiving as to the fairness and judicial nature of the proceedings as in a most effective, although perhaps intangible way, would prevent a rightly conducted trial. How apparent this result would be, if we suppose that the minds, not of one only, but of all of the participants in a trial—attorneys, witnesses, interested parties, court attendants— had been separately poisoned by whisperings to the effect that the court and jury had been corrupted or were motivated by personal interests. It would be impossible that such an atmosphere thus created should not reach and tend to affect judge and jury. One who by his acts creates or helps to create such an atmosphere of suspicion in a very real sense does impede and hinder the administration of justice.

2. The contention of plaintiff in error that the letter written by him to the special assistant to the Attorney General was a privileged communication merits serious consideration. The legal theory relied on is that any citizen having knowledge of a violation of the laws of the United States may and is duty bound to communicate that knowledge to the government and will be protected in so doing. Unquestionably that is the law. In the case of In re Quarles and Butler, Petitioners, 158 U. S. 532, 535, 15 S. Ct. 959, 960 (39 L. Ed. 1080), it was said by the Supreme Court:

"It is the duty and the right, not only of every peace officer of the United States, but of every citizen, to assist in prosecuting, and in securing the punishment of, any breach of the peace of the United States. It is the right, as well as the duty, of every citizen, when called upon by the proper officer, to act as part of the posse comitatus in upholding the laws of his country. It is likewise his right and his duty to communicate to the executive officers any information which he has of the commission of an offense against those laws; and such information, given by a private citizen, is a privileged and confidential communication, for which no action of libel or slander will lie, and the disclosure of which cannot be compelled without the assent of the government."

In Vogel v. Gruaz, 110 U. S. 311, 316, 4 S. Ct. 12, 15 (28 L. Ed. 158), the Supreme Court approved the following language of the Supreme Judicial Court of Massachusetts in Worthington v. Scribner, 109 Mass. 487, 488 (12 Am. Rep. 736, 737):

"It is the duty of every citizen to communicate to his government any information which he has of the commission of an offense against its laws. To encourage him in performing this duty without fear of consequences, the law holds such information to be among the secrets of state, and leaves the question how far and under what circumstances the names of the informers and the channel of communication shall be suffered to be known, to the absolute discretion of the government, to be exercised according to its views of what the interests of the public require."

 The acts of the plaintiff in error, however, were not within the protection of this privilege.

First of all, the letter which was written by the plaintiff in error was not a communication to any official of the government having any duty to institute a prosecution for any of the offenses suggested in the letter. It is the duty of the President of the United States to execute the laws. It is the duty of the Attorney General of the United States to superintend the enforcement of the criminal statutes throughout the land. In any of the judicial districts of the United States it is the duty of the United States attorney in that district to prosecute criminal cases. A communication from a citizen to any of these officials, apprising them of violations of law, undoubtedly would be privileged. A communication concerning improper conduct of a federal judge to a member of the House of Representatives, which body may institute impeachment proceedings, doubtless also would be privileged. A special assistant to the Attorney General, however, such as was Mr. Pratt, has only such duties as he may be directed to perform by the Attorney General in connection with particular cases to which he has been assigned, and is in no sense a law enforcement officer with any general authority to prosecute for violations of law. A communication to such a special assistant to the Attorney General is not, therefore, a communication to the government within the protection of the privilege asserted. Secondly, the letter which was written by the plaintiff in error on its face shows that it was not intended as a communication to the government made for the purpose of bringing to justice offenders against the law, but that its sole object was to affect a particular case pending in court. The privilege claimed does not protect such a communication.

The judgment of the District Court is affirmed.