CHARLES F. VAN SWERINGEN, PLAINTIFF, v. KATHERIN T. VAN SWERINGEN, DEFENDANT, AND MILTON G. ABARBANEL, INTERVENOR-DEFENDANT.

IN THE MATTER OF L. EDWARD KATZ, AN ATTORNEY AND DEFENDANT-APPELLANT HEREIN.

Argued October 1, 1956—Decided November 5, 1956.

Mr. *Morton Stavis* argued the cause for the defendant-appellant (*Mr. John O. Bigelow,* attorney).

Mr. *William J. Arnold,* Assistant Prosecutor, argued the cause for the respondent State of New Jersey. *Mr. Guy W. Calissi,* County Prosecutor of Bergen County, attorney. *Mr. William C. Brudnick,* Special Assistant Prosecutor, on the brief.

The opinion of the court was delivered by

BURLING, J.   This matter concerns the conviction of the defendant, L. Edward Katz, a New Jersey attorney for criminal contempt.   He was found guilty of attempting to obtain money from Milton and Zelma Abarbanel on the representation of being able to procure a favorable judgment in a divorce proceeding wherein Milton Abarbanel was named as a co-respondent.   Katz was found guilty and sentenced to four months' imprisonment.   The Superior Court, Appellate Division, affirmed, *Van Sweringen v. Van Sweringen,* 34 *N. J. Super.* 394 (1955), and Katz was committed under a judgment entered on March 23, 1955.   A petition for certification was filed with this court and denied, *In re Katz,* 19 *N. J.* 328 (1955), but was subsequently reconsidered and granted, 21 *N. J.* 337 (1956).

Only a brief summation of the *alleged* circumstances from which the conviction arose will be set forth.   Abarbanel, a physician, was named as co-respondent in a divorce suit initiated by a husband against his wife on grounds of adultery. Undoubtedly concerned about his professional reputation, he initially contacted his friend Katz (who did not represent Abarbanel in the divorce action) in an endeavor to keep his name out of the newspapers.   During the course of the action word came to Abarbanel through a fellow physician, Dr.

Reich, that his case was faring badly. In the very words of the undiscriminating court reporter Friedman, who had originally imparted the opinion:

"Q. Mr. Friedman, would you give us the conversation as you recall it to the best of your ability at this time? A. Upon a professional visit to Doctor Reich's office, Doctor Reich, in the process of examination said to me, 'Dave, what's going on up in your Court Room with this Doctor Abarbanel?' I then said to Doctor Reich he was named as a co-respondent, the schmo in a divorce action, and from the testimony that has been taken, it didn't look too good for the Doctor, that being my opinion."

Alarmed, Abarbanel asked Katz to endeavor to obtain some information on the case. Subsequently Katz informed the doctor by telephone that he had important information and that evening called at Abarbanel's office.

It was at this time that Katz allegedly informed Abarbanel that a decision favorable to him could be purchased for $700, later raised to $1,500. The offer was declined. A decision was handed down which absolved the doctor from the charge against him.

Information of the episode subsequently reached Judge Hegarty who had tried the divorce action. He immediately called the Abarbanels, Katz, and representatives of the Bergen County Prosecutor's Office and the Ethics and Grievance Committee of the Bergen County Bar before him. Counsel for Abarbanel (other than his attorney in the divorce matter) was apparently unable to be present but had advised his client to tell the truth without submitting to an oath. It was upon this information obtained from the Abarbanels that an order to show cause why he should not be held in contempt was subsequently issued to Katz. The latter, however, was made aware of the Abarbanel statements immediately after they were given.

The record is not clear as to who was to receive the money other than Katz if the offer was accepted. Abarbanel said Katz refused to mention any names and would neither confirm nor deny suggestions made by Abarbanel. If the intimation was that Friedman, the court reporter, could change the decision, the insinuation would necessarily involve the

complicity of Judge Hegarty himself. In any event, the allegations are of the most serious import.

The trial was conducted before Judge Hegarty and Katz was found guilty. Additional evidence was received by the Appellate Division on appeal which sought to attribute a psychotic personality to Abarbanel. That court, as previously noted, affirmed.

A number of errors are raised but in view of the disposition of the case only three issues demand consideration:

1. Is a sworn affidavit supporting an order to show cause why punishment should not be imposed upon the alleged contemnor a jurisdictional requisite?

2. Assuming the alleged facts to be true, do they establish a criminal contempt?

3. Should the trial judge have disqualified himself from hearing the cause?

The Appellate Division afforded the first question extensive consideration, *Van Sweringen v. Van Sweringen, supra,* 34 *N. J. Super.,* at *pages* 399 to 403, and inasmuch as we are in accord with the view there expressed there is no necessity to restate it at length. There has not been a uniform practice in this State nor the country at large in requiring a sworn statement reciting the facts upon which the alleged contempt is based. *In re Cheeseman,* 49 *N. J. L.* 115, 142–143 *(Sup. Ct.* 1886); and for the most recent collection of decisional authority, *Annotation, "Constructive Contempt—Affidavit,"* 41 *A. L. R. 2d* 1263 *et seq.* The rules of court relevant to criminal contempt do not express the requirement, *R. R.* 3 :8–1 to 3, 4 :87–1 to 3; and, as stated below, emphasis today is placed upon notice and a fair hearing. Katz was fully apprised of the charge against him and was afforded ample opportunity to prepare his defense. He was not denied a fair hearing through the absence of a sworn statement. There is much to commend the necessity of an oath in instituting contempt proceedings of other than a summary nature (*e. g.,* to preclude frivolous charges) but this is at most a matter which suggests amendment of court rule, not a ground of reversal in the instant situation.

■ The order to show cause recited that statements had been given the court that Katz sought to influence the Abarbanels into paying him an amount of money for the purpose of obtaining a favorable judgment in the divorce action "through influence alleged to be possessed by David Friedman, an official court reporter employed by the said court." Defendant Katz argues that were the allegation proven it would fall short of a contempt of court because it fails to charge a direct contact by Katz with the court reporter or the court itself. We are told that nothing less than an open and direct interference with the course of the judicial process is essential to constitute contempt.

The line of cases which concern a publicized statement which reflects criticism of a particular court or judicial officer because of a judgment rendered in a particular case, e. g., *In re Bozorth,* 38 *N. J. Super.* 184 *(Ch. Div.* 1955), are not relevant. The intimation here is that a favorable decision could be purchased through intercession with the court reporter or the judge himself.

The guidepost for decision is *In re Caruba,* 139 *N. J. Eq.* 404 *(Ch.* 1947) affirmed *per curiam* 140 *N. J. Eq.* 563 *(E. & A.* 1947), petition denied 142 *N. J. Eq.* 358 *(Ch.* 1948), *certiorari* denied 335 *U. S.* 846, 69 *S. Ct.* 69, 93 *L. Ed.* 396 (1948), where it was said:

"None of the New Jersey cases cited. is authority for the proposition advanced. They hold uniformly that any act or conduct which obstructs or *tends to obstruct* the course of justice constitutes a contempt of court." 139 *N. J. Eq.,* at *page* 411.

In *In re Merrill,* 88 *N. J. Eq.* 261 *(Prerog.* 1917), an offer of bribe addressed to the Ordinary was held to be a contempt. Similarly an attempt to purchase a juror's vote although unknown to the juror, *Brewer v. State,* 176 *Miss.* 803, 170 *So.* 540 *(Sup. Ct.* 1936), and an invitation to the defendant's father to bargain for a favorable decision although it appeared that the contemnor's only purpose was to defraud the father, *Little v. State,* 90 *Ind.* 338, 46 *Am. Rep.* 224 *(Sup. Ct.* 1883), were held to be contempts. "The

reasonable tendency of the act done is the proper criterion." *Sinclair v. United States,* 279 *U. S.* 749, 764, 49 *S. Ct.* 471, 73 *L. Ed.* 938, 946 (1929). Here the Abarbanels were allegedly led to believe that a decision could be reached oblivious of the merits of the case, an impression which would be made all the more indelible upon their minds because it allegedly came from a member of the bar and an officer of this court.

In *Froelich v. United States,* 33 *F.* 2d 660 (8 *Cir.* 1929), the contemnor had addressed an anonymous letter to an attorney participating in a criminal proceeding which cast a grave suspicion upon the impartiality of the court and its officers. In holding that the letter was not a privileged communication and constituted a contempt, the court stated:

"The tendency of the letter was to create in the mind of the recipient, an attorney in a case then pending, a suspicion as to the integrity of the judge, a possible belief in that attorney's mind that the result of the trial would be influenced by something other than the merits. He would be led to suspect, not only the judge, but the jury and the officers of the court. From these suspicions would arise such an atmosphere of doubt and misgiving as to the fairness and judicial nature of the proceedings as in a most effective, although perhaps intangible way, would prevent a rightly conducted trial. How apparent this result would be, if we suppose that the minds, not of one only, but of all of the participants in a trial—attorneys, witnesses, interested parties, court attendants—had been separately poisoned by whisperings to the effect that the court and jury had been corrupted or were motivated by personal interests. It would be impossible that such an atmosphere thus created should not reach and tend to affect judge and jury. One who by his acts creates or helps to create such an atmosphere of suspicion in a very real sense does impede and hinder the administration of justice." 33 *F.* 2d, at *page* 663.

See also *Fox v. United States,* 77 *F.* 2d 210 (4 *Cir.* 1935), *certiorari* denied *Ex parte Fox,* 298 *U. S.* 642, 56 *S. Ct.* 935, 80 *L. Ed.* 1374 (1936); *Conley v. United States,* 59 *F.* 2d 929 (8 *Cir.* 1932); *In re Buckley,* 69 *Cal.* 1, 10 *P.* 69 (*Sup. Ct.* 1886). But compare *United States v. Carroll,* 147 *F.* 947 (*D. C. Mont.* 1906). It was not disputed below that the conduct charged against defendant Katz constituted a criminal contempt. We hold that if the allegations are

proved beyond a reasonable doubt, a clear case of criminal contempt is made out. *Swanson v. Swanson,* 10 *N. J. Super.* 513, 520–521 (*App. Div.* 1950) affirmed 8 *N. J.* 169 (1951).

██ Lastly, it is contended, and we think successfully, that Judge Hegarty should have disqualified himself from hearing the contempt proceeding. At the outset it is pointed out that the issue is first presented on this appeal. Katz made no objection at the trial level, and before the Appellate Division expressly disclaimed any challenge to this aspect of the case. The issue was not brought forward on the petition for certification, *R. R.* 1:10–9. For these reasons we would not, except in the most extraordinary circumstances, respond to the issue. *State v. LeFante,* 14 *N. J.* 584 (1954). The instant case represents the exception rather than the rule.

On the merits of the issue the State contends that consent was given (that Judge Hegarty should hear the contempt) because no objection was raised. *R. R.* 4:87–2(*d*) provides:

"If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the consent of the person charged with contempt."

*R. R.* 3:8–2(*d*) of the criminal practice rules is of similar import. These rules are to be distinguished from the summary procedure for punishing contempt when the contemptuous conduct is committed in the actual presence of the court. *R. R.* 3:8–1; 4:87–1.

██ It has long been recognized that where a contempt has been perpetrated in the actual presence of a judicial officer he may himself summarily dispose of the offense. *Ex parte Terry,* 128 *U. S.* 289, 9 *S. Ct.* 77, 32 *L. Ed.* 405 (1888); *Fisher v. Pace,* 336 *U. S.* 155, 69 *S. Ct.* 425 93 *L. Ed.* 569 (1949). Where, however, the contempt is not within the presence of the court, the course is to follow more rigidly the traditional demands of due process. *Cooke v. United States,* 267 *U. S.* 517, 45 *S. Ct.* 390, 69 *L. Ed.* 767 (1925). The reason for the distinction is discussed by Chief Justice Taft in the *Cooke* case and in *Offutt v. United States,* 348 *U. S.* 11, 14, 75 *S. Ct.* 11, 99 *L. Ed.* 11, 16

(1954), Mr. Justice Frankfurter, in discussing the summary power, stated:

"The pith of this rather extraordinary power to punish without the formalities required by the Bill of Rights for the prosecution of federal crimes generally, is that the necessities of the adminstration of justice require such summary dealing with obstructions to it. It is a mode of vindicating the majesty of law, in its active manifestation, against obstruction and outrage. The power thus entrusted to a judge is wholly unrelated to his personal sensibilities, be they tender or rugged."

The *Offutt* case concerned a direct contempt, yet even there the high court held that the trial judge should have disqualified himself because both judge and the counsel cited for contempt had become "personally embroiled" with each other.

■ Here we are confident that Judge Hegarty did not become "embroiled" with the defendant Katz, but the import of this alleged fraudulent scheme goes much deeper than the "disrespect" or "criticism" of which *R. R.* 4:87-2 (*d*) speaks. It connotes personal dishonesty of the court and its officers, a complete disavowal of the basic responsibility of administering justice. Where this is so justice itself, although maligned, demands that one not so intimately concerned sit in judgment.

A further observation of the procedure followed dispels any doubt we have in ordering a new trial. When the Abarbanels were initially called before Judge Hegarty he personally examined them. The information which was elicited by this interrogation formed the basis for the order to show cause. The situation is not dissimilar with that involved in *In re Murchison*, 349 *U. S.* 133, 75 *S. Ct.* 623, 99 *L. Ed.* 942 (1955), where a state judge, sitting as a "one-man grand jury" under Michigan statute, cited a witness for contempt. He proceeded then to conduct a hearing on the contempt in his judicial capacity. (It had been previously determined that a witness could not be summarily punished under this statute, *In re Oliver*, 333 *U. S.* 257, 68 *S. Ct.* 499, 92 *L. Ed.* 682 (1948)). The Supreme Court

in *Murchison* held that the judge could not preside at the contempt hearing. Mr. Justice Black stated:

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law.' *Tumey v. State of Ohio*, 273 *U. S.* 510, 532, 47 *S. Ct.* 437, 444, 71 *L. Ed.* 749 [758, 50 *A. L. R.* 1243]. *Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.* But to perform its high function in the best way 'justice must satisfy the appearance of justice.' *Offutt v. United States*, 348 *U. S.* 11, 14, 75 *S. Ct.* 11, 99 *L. Ed.* 11, 13." 349 *U. S.*, at *page* 136, 75 *S. Ct.*, at *page* 625, 99 *L. Ed.*, at *page* 946. (Emphasis supplied.)

In passing, it is to be observed that we have not considered or resolved the factual issues. It is particularly desirable in the circumstances of this case that a prejudgment of fact be made by a trial judge who has observed all the witnesses because credibility plays such a large role. The opinion of the Appellate Division lends the impression that the court was reluctant to undertake a general evaluation of the evidence taken at the trial level and as affected by the further original evidence which it ordered by deposition. This, undoubtedly, in view of the important role of the trial court in observing the witnesses at first-hand, a factor recognized in the philosophy of the court rules relating to factual review where the findings are made by a judge rather than a jury. *R. R.* 1:5–4(*b*). The Appellate Division was of the opinion that *R. R.* 1:5–2 (made applicable to the Appellate Division, *R. R.* 2:5) commanded this action. *R. R.* 1:5–2 provides:

"Every summary conviction and judgment of a trial court for a contempt shall be reviewable upon appeal both upon the law and the facts. The appellate court shall give such judgment as it shall

deem to be lawful and just under all the circumstances of the case and shall enforce the same as it shall order."

And see *N. J. S.* 2A:10–3; *Zimmerman v. Zimmerman,* 12 *N. J. Super.* 61, 69 (*App. Div.* 1950). Does the "summary conviction" of which *R. R.* 1:5–2 speaks encompass only those convictions for contemptuous conduct in the actual presence of the court? See *R. R.* 3:8–1, 4:87–1. Does it reach contempt convictions where a hearing has been afforded but the same judge whose court has been contemned sits in judgment? Or does it contemplate all convictions for criminal contempt? Only *R. R.* 3:8–1 and 4:87–1 which deal with contempts in the actual presence of the court use the term "punished summarily." "Summary conviction" is defined as a conviction of an offense without the formality of a trial, as in certain cases of contempt. *Ballentine's Law Dictionary* (2d ed. 1948), 1954 *Supp.* The same authority regards a "summary proceeding" as one in which many formalities are dispensed with. *Cf. Application of Wellhofer,* 16 *N. J. Super.* 60 (*Law Div.* 1951). There is no constitutional right to jury trial for contempts *in facie curiae. Gompers v. Buck's Stove & Range Co.,* 221 *U. S.* 418, 450, 31 *S. Ct.* 492, 55 *L. Ed.* 797, 809 (1911); *State v. Doty,* 32 *N. J. L.* 403 (*Sup. Ct.* 1868). Notice and hearing are required for alleged contempts not in the actual presence of the court, *R. R.* 3:8–2, 4:87–2. But see *R. R.* 8:8–1; *State v. Zarafu,* 35 *N. J. Super.* 177 (*App. Div.* 1955). Where these traditional concepts of the judicial process are observed is a resulting conviction "summary" in nature? The parties have not broached the question nor is it necessary to our decision; hence we do not decide it.

For the reasons expressed in this opinion the judgment will be reversed and the cause remanded for a new trial before a judicial officer designated by the Assignment Judge of Bergen County, or as the Chief Justice may direct.

*For reversal and remandment*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and JACOBS—5.

*For affirmance*—None.