42 N.J. Super. 521 (1956)
127 A.2d 198
ANTHONY J. YONADI AND HELEN YONADI, PLAINTIFFS-PETITIONERS,
v.
HOMESTEAD COUNTRY HOMES, INC., HOMESTEAD SHORE AND COUNTRY HOMES, INC. AND BOROUGH OF SPRING LAKE HEIGHTS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 5, 1956.
Decided November 29, 1956.
*522 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Clarkson S. Fisher argued the cause for plaintiffs (Mr. Edward F. Juska, attorney).
Mr. William J. O'Hagan argued the cause for defendants Homestead Country Homes, Inc., and Homestead Shore and Country Homes, Inc. (Messrs. Stout and O'Hagan, attorneys).
Mr. Robert V. Carton argued the cause for defendant Borough of Spring Lake Heights (Messrs. Durand, Ivins & Carton, attorneys).
*523 The opinion of the court was delivered by CLAPP, S.J.A.D.
This matter comes before us on a petition by the plaintiffs asking for a recall of our mandate, entered herein on May 13, 1955 pursuant to our opinion, Yonadi v. Homestead Country Homes, 35 N.J. Super. 514. The petition, filed April 27, 1956, rests entirely on Armstrong v. Francis Corp., 20 N.J. 320, decided January 19, 1956. In both Yonadi and Armstrong the concern of the courts was with the law of casual surface waters; in the latter case the Supreme Court adopted the rule of reasonable use, while in the former case we attempted to follow the common enemy rule.
In brief, the circumstances in Yonadi are these. The plaintiffs own a golf course and restaurant. The defendants are Homestead Country Homes, Inc., Homestead Shore and Country Homes, Inc., and the Borough of Spring Lake Heights. Homestead Shore and Country Homes, Inc., erected 169 homes on a tract of 40 acres that had theretofore been used for farming. From these 40 acres, the surface water drains naturally on to plaintiffs' property; however, according to the testimony, the run-off, as a result of a development such as this, is about 3 1/2 times that coming from the farm land previously there. Homestead Country Homes, Inc., is joined as a defendant because it formerly owned this land. As for the borough, it is made a defendant by reason of the fact  to put the matter generally  that in 1952 and 1956 it accepted deeds to streets lying in various parts of the 40 acres (not merely in 28 acres  the point left open in 35 N.J. Super., at page 524 has since been cleared up) and has been negligent in maintaining the drains lying in those streets.
When the petition for a recall of the mandate was presented, we called for briefs and argument on certain questions. Since then, some time has been lost because of a prospect, which once offered itself, of a public appropriation of money, designed to remedy the drainage difficulties here. That prospect apparently has fallen through.
*524 Plaintiffs seemed to agree on the oral argument that if their position is granted, the case will doubtless have to be remanded and relitigated in the light of the reasonable use doctrine. Furthermore, plaintiffs expressly conceded that in all fairness defendants should be permitted on such a relitigation to raise questions as to prescriptive rights which they claim to have in several drainage ditches, a swale, a brook, and a pipe, all of which formerly existed on plaintiffs' property. Through these drainage facilities, the surface water running off the 40 acres was at one time carried across the land now held by plaintiffs, and thence over other properties eventually to the sea. The ditches, the swale and the brook were filled in by plaintiffs or their predecessors in title; they interfered with the golf course. As for the pipe, it allegedly was allowed by plaintiffs to get in a state of disrepair and to become broken and filled up. There was uncontradicted testimony that these facilities, had they remained, would have taken care of the surface waters running off the 40 acres currently.
Moreover, if the mandate is to be recalled and the case again remanded with directions with respect to the relitigation, the defendant borough seeks to interpose other defenses, namely, that there was no active wrongdoing on its part and in addition that it should not be charged with its engineer's knowledge of circumstances which he acquired while acting privately as Homestead's engineer. See Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 481 (1952); Millhurst Milling & Drying Co. v. Automobile Ins. Co., 31 N.J. Super. 424, 431 (App. Div. 1954), and cases cited. As we understood the oral argument before us, plaintiffs conceded that it was only fair that the borough be permitted to present such issues as these on the remand.
Plaintiffs also agreed that on such a remand it would abandon any claim it had made against the defendant Homestead Country Homes, Inc. That corporation, in fact, had taken no part in the development. These several concessions deal with points that (except for the responsibility of *525 Homestead Country Homes, Inc.) seem not to have been brought to the attention of the Chancery Division.
Defendants urge that consideration be given to three other circumstances, heretofore developed at the trial, which go to the question of contributory fault on the part of other developers and of plaintiffs. We mention them, though we need pass neither upon them, nor upon the effect of plaintiffs' contributory fault under the doctrine of reasonable use. First, it is to be noticed that the 40 acres constitute but a part of a single watershed of 250 acres, which drain into plaintiffs' lands; defendants claim that since 1950 (when Homestead started its development) other developments in the same watershed, containing about 100 homes located on 30 acres, have added to the water which has run off on to plaintiffs' lands. Defendants argue that they should be chargeable for only about 4/7ths of the increase in the flow of the water thrown upon plaintiffs' lands by these developments totalling 70 acres. Second, defendants claim that there was a serious drainage problem before Homestead started its development in 1950 and that they should not be chargeable with that. In fact, in 1948 the borough and the county appropriated $7,500 to $10,000 in an endeavor to solve that very problem, but (according to testimony submitted on defendants' behalf) plaintiffs then, quite independently, refused to allow an entry on their property unless one of these public bodies would agree to lay the drain pipes where plaintiffs wanted them to go. Even though the appropriations appear in any case to have been inadequate, nevertheless a part of the problem might then have been worked out, had it not been for plaintiffs' independence at the time. The appropriations lapsed. Third, defendants allege that plaintiffs themselves have contributed to their own problems by "hard-topping" a parking lot of an acre and a half in this watershed. According to the testimony, the water running off this lot, flowing allegedly into plaintiffs' golf course and restaurant, amounts, because of the hard-topping, to nine times that running off the same quantity of land, if it had remained vacant  that is, the lot gives off *526 the same amount of water that would have come from 13 vacant acres. If the mandate were to be vacated and the doctrine of reasonable use applied, these matters should all be re-examined in the light of that doctrine.
One of the questions now presented is, whether the law imposes any limitation on the time within which an application may be made for the recall of a mandate. R.R. 1:9-4 and 2:9-2 authorize a petition for rehearing to be made, provided it is filed and served within ten days after the entry of the mandate. Cf. U.S. Supreme Court Rule 58. After the lapse of the ten days, the mandate and the record are remitted to the court below, R.R. 1:9-1; thereupon the appellate court loses jurisdiction over the cause, Putnam v. Clark, 35 N.J. Eq. 145 (E. & A. 1882). However, as will appear, it has a certain power to reinvest itself with jurisdiction; as the phrase goes, it recalls its mandate.
The rule in many other jurisdictions is that the authority of an appellate court to recall its mandate expires with the term in which the mandate is entered (Noonan v. Bradley, 12 Wall. 121, 79 U.S. 121, 129, 20 L.Ed. 279, 281 (1871); 5 C.J.S., Appeal and Error, § 1996) except in cases of fraud (Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 244, 245, 64 S.Ct. 997, 88 L.Ed. 1250, 1254, 1255 (1944)) or most exceptional circumstances (Briggs v. Pennsylvania R. Co., 164 F.2d 21, 23, 1 A.L.R.2d 475 (2 Cir. 1947)). Under such a rule, if the mandate goes down on the first day of the term, an applicant for its recall may take things leisurely; but if it goes down on the last day, he must scurry about because the authority of the court evaporates "in Cinderella fashion at midnight on" that day. Cf. Schnitzer & Wildstein, N.J. Rules Serv. A IV-117; R.R. 4:6-2. For the term of this court, see R.R. 2:1-2.
In our State the appellate courts have said very generally that they may amend their mandates "at any time" to correct any error or fraud, and indeed have frequently recalled them for reargument or to correct injustices arising from mistakes or misapprehensions. Friedman v. National Casualty Co., 133 N.J.L. 567, 568, 569 (E. & A. 1946) *527 (but cf. also the observation of the court that "this was all within the term"); King v. Ruckman, 22 N.J. Eq. 551, 553, 554 (E. & A. 1871); see Daniel v. Elmer, 113 N.J.L. 227, 228 (Sup. Ct. 1934); cf. Pink v. Deering, 125 N.J.L. 569, 572 (Sup. Ct. 1941), allowing correction within the time for appeal. However, R.R. 1:9-4 had no counterpart under our former practice. Generally as to the policies of our appellate courts in connection with rearguments, see Cassedy v. Bigelow, 27 N.J. Eq. 505 (E. & A. 1875).
We are satisfied that under the present practice, notwithstanding the lapse of the ten days referred to in R.R. 1:9-4, this court has the power to recall its mandate and reconsider a case in the interests of justice in exceptional situations, provided the application for the recall is made within a reasonable time under the circumstances. For a recent case in the Supreme Court, see In the Matter of Katz, 19 N.J. 328, where on September 12, 1955 certification was denied; on April 23, 1956 the "previous action [was] reconsidered and certification [was] granted," 21 N.J. 337; see further Van Sweringen v. Van Sweringen, 22 N.J. 440 (1956).
The only exceptional matter presented here, that might be said to take the case out of R.R. 1:9-4, is plaintiffs' claim that Armstrong in effect overruled the common enemy doctrine which we attempted to follow in Yonadi and, as a result, their case has been placed in an entirely different position. However, it is to be observed that the Supreme Court in Armstrong said that though our courts have not in terms recognized the doctrine of reasonable use, nevertheless they "have actually come out at" that doctrine. 20 N.J., at pages 328, 329. Note, too, that the commentator, discussing Yonadi in 54 Mich L. Rev. 575 (1956), claims that the holding in the case is consonant with that doctrine.
On the other hand, as the Supreme Court noted in its strong opinion in Armstrong, 20 N.J., at page 330, the rule of reasonable use entails this result:
"* * * while today's mass home building projects * * * are assuredly in the social good, no reason suggests itself why, in justice, the economic costs incident to the expulsion of surface waters *528 in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than by those who engage in such projects for profit."
What effect this guardedly stated observation may have upon the present circumstances, we need not say. Cf. Yonadi v. Homestead Country Homes, 35 N.J. Super., at page 523, citing Restatement, Torts, § 833b. In any event, Armstrong does seem to us to have put quite a different aspect on the applicable law. Of course, changes in our case law operate retroactively as well as prospectively. Arrow Builders Supply Corp. v. Hudson Terrace Apts., 16 N.J. 47 (1954).
But if we find that Armstrong brought about a change in the law, we then are faced with another procedural difficulty. There is a line of authority in this State holding rather strictly that a petition for a rehearing is in essence but a bill of review and therefore that a rehearing in a trial court cannot be granted after the time for appeal has expired, on the ground that a court of last resort has subsequently handed down a decision changing the law. Miller v. McCutcheon, 117 N.J. Eq. 123, 129, 130 (E. & A. 1934), and cases cited, including Smith v. Colonial Woodworking Co., Inc., 110 N.J. Eq. 418, 160 A. 351, an application for a rehearing in a law action before the Court of Errors and Appeals; Breen Iron Works v. Richardson, 115 N.J.L. 305, 309, 310 (Sup. Ct. 1935), affirmed 117 N.J.L. 150 (E. & A. 1936); General Motors Acceptance Corp. v. American, etc., New York, 113 N.J.L. 139, 141, 142 (Sup. Ct. 1934); 7 Moore's Federal Practice, § 60.22[3], dealing with Rule 60(b) of the Federal Rules of Civil Procedure (corresponding to R.R. 4:62-2). It is to be noted that there was no right of appeal from our judgment in Yonadi and that R.R. 1:10-4 allows only 20 days within which to file a petition for certification with respect thereto.
On the other hand, see Isserman v. Isserman, 2 N.J. 1, 5 (1949). While the cause there was pending in the trial court as a result of the mandate in Isserman v. Isserman, *529 138 N.J. Eq. 140 (E. & A. May 3, 1946), the United States Supreme Court handed down Sherrer v. Sherrer, 334 U.S. 343, 68 S.Ct. 1087, 1097, 92 L.Ed. 1429 (June 7, 1948) (two years after the mandate). Justice Case for the Supreme Court, in 2 N.J., at page 5, said that in that situation:
"* * * it was his [respondent's] privilege to go to the Court of Errors and Appeals, setting forth the new matter, and seek a recall of the remittitur and a review." (Italics added.)
We shall assume, as plaintiffs contend (though without resolving the matter), that Armstrong effected a change in the law and that this court may recall its mandate in the event of a change in the law, at least while the case is still pending and undetermined in the trial court. The issue then to be determined is whether the present application for a recall was made within a reasonable time under the circumstances and whether it is in the interests of justice that the matter be relitigated.
Some mention should be made first of the lapse of time. The petition for the recall was filed 11 1/2 months after the mandate had been entered. Moreover, there has been an inordinate delay in bringing on the matter for further hearing before the Chancery Division of the Superior Court in accordance with our mandate. Ten days after the entry of the mandate the Clerk of the Superior Court sent a copy of it, in accordance with the practice, to the County Clerk of Monmouth (where the venue was laid) with this notation stamped upon it:
"To the Clerk of the County of Monmouth: This case should be listed for retrial or immediately taken up with the trial Judge for disposition. I Grant Scott, Clerk."
We are advised by defendants that plaintiffs
"did absolutely nothing to cause this matter to be brought on for further hearing [in the Chancery Division] in accordance with the terms of the mandate."
*530 On a previous oral argument, plaintiffs sought to exonerate themselves in the premises. Be that as it may, it nevertheless remains a fact that by reason of the failure to proceed with the litigation for over six months, the case could, if the circumstances warranted it, have been dismissed under R.R. 1:30-3. Having in view the lack of prosecution, we questioned whether plaintiffs on the motion for the recall should be permitted to draw to themselves any advantage (as they seek to do) because the case under the pending mandate is still undisposed of and, to use their phrase, is not now a fait accompli.
However, the case is largely a fait accompli. Defendants could relieve themselves from any liability for injunctive relief by merely re-channelling the surface water running off a certain ten acres (see 35 N.J. Super., at page 524) so that it would flow to substantially the place where it would otherwise have gone, had it not been for the development. When this is done, there would remain for determination only the question as to what part of the $2,500 damages (previously awarded to the plaintiffs by the Chancery Division) was allocable to these ten acres.
However, we do not rest our decision merely on the lapse of time or on the fact that the litigation is largely completed, for the philosophic tendencies of our system of practice, particularly in discretionary matters, are to mete out justice as the circumstances of the case warrant, and in a case such as this, to make amends, if a wrong has been done. We accordingly turn to the equities of the situation. The equities of the plaintiffs are quite apparent. But what of defendants' equities? If the developer, his engineer and his counsel could not have been said to have been on notice that the reasonable use rule would be applied, there is an especial inequity in applying it retroactively here. For had the developer been on notice that it would be obliged to provide such drainage facilities as might be reasonably required of it in order to protect plaintiffs' lands, it doubtless would have called upon those purchasing homes from it, each to pay his proportionate share of the cost thereof; *531 such a cost  according to the plan that counsel say was apparently approved by the Chancery Division  might amount (under estimates made some years ago) to perhaps $90,000 or $180,000 (it is not clear which plan was approved by the Chancery Division). The inequity of course lies in calling upon the developer retroactively, after many homes have been sold, to pay out of its own net profits this cost resulting from a retroactive change in the law.
Plaintiffs could hardly contend that the developer and his counsel should have been on notice of this change in the law. For on the argument before us, their counsel very frankly stated that he had made no application to the Supreme Court for certification because in his judgment not only did the common enemy doctrine obtain in this State, but it had been followed by this court  in short, he saw no good ground to seek certification. It may also be added that the developer's experienced engineer had, as noted in our opinion in Yonadi v. Homestead Country Homes, 35 N.J. Super., at page 524, felt that his obligation too was to follow the common enemy doctrine, and that he had accordingly done so, except as stated in the opinion at the page cited.
We should mention, too, that if we open up the case, we also (as already indicated) open the door to new litigation over active wrongdoing, prescriptive rights and contributory fault on the part of the plaintiffs, as well as a number of questions which immediately arise as to what was reasonable under the circumstances. Of course, drainage facilities carrying the water over the plaintiffs' property to the next lowland proprietor is not a reasonable solution.
Mindful then not only of the lapse of time, but also of these circumstances and the equities involved, we conclude that the application for the recall of the mandate should be denied.